UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

SHARON D. LEWIS,

     Plaintiff,                             Case No. 12-11851

v.                                          Hon. Gerald E. Rosen
                                          Mag. Judge Laurie J. Michelson

DETROIT PUBLIC SCHOOLS and
DEBORAH JENKINS,

     Defendants.

_____/

**REPORT AND RECOMMENDATION TO**
**GRANT IN PART DEFENDANTS' MOTION FOR DISMISSAL OF COMPLAINT IN**
**ITS ENTIRETY [51], TO DISMISS PLAINTIFF'S COMPLAINT, AND TO DENY**
**PLAINTIFF'S MOTION FOR A TEMPORARY INJUNCTION [65] AS MOOT**

Plaintiff Sharon Lewis was formerly a high-school teacher for Defendant Detroit Public Schools. Defendant Deborah Jenkins was the principal at Martin Luther King Jr. Senior High School in Detroit, Michigan where Lewis taught. The allegations in Lewis' Third Amended Complaint suggest the two did not get along. Lewis, however, says that her relationship with Jenkins went beyond mere discord: she says Jenkins discriminated against her because of her age. Lewis also alleges that she was exposed to asbestos during the demolition of the old Martin Luther King Jr. High School building and then exposed to gas fumes at the school's new facility. Lewis believes that Jenkins or others employed by the Detroit Public Schools are responsible for her exposure and subsequent health problems. Based on these allegations Lewis filed this pro se lawsuit pursuant to the Age Discrimination in Employment Act of 1967. Lewis' complaint, however, fails to state a claim under that Act. Accordingly, and for the reasons detailed below, this Court RECOMMENDS that Lewis' Third Amended Complaint be DISMISSED.

# I.

Defendants test the sufficiency of Lewis' Third Amended Complaint pursuant to Federal Rule of Civil Procedure 12(b)(6).[1] As such, the Court must accept as fact the complaint's non-conclusory allegations and draw every reasonable inference from those allegations in Lewis' favor. *See Hunter v. Sec'y of U.S. Army*, 565 F.3d 986, 992 (6th Cir. 2009). The following summary adheres to this standard.

Lewis was 48 years old when the events that gave rise to this suit began. (Dkt. 39, 3d Am. Compl. at 2.) She holds a B.S. and M.S. in Computer and Information Systems and has completed substantial course work toward a doctorate in education. (3d Am. Compl., Ex. B.) With this background, Lewis obtained a position with the Detroit Public Schools ("DPS") as a computer teacher. (*See* 3d Am. Compl. ¶¶ 2, 7.)

*Despite an Unwelcoming First Day, Lewis Completes the 2010-2011 School Year*

The first of numerous events giving rise to this suit took place on October 13, 2010: Lewis' first day teaching at Martin Luther King Jr. Senior High School in Detroit, Michigan ("MLK High"). (3d Am. Compl. ¶¶ 2, 7.) That day, Defendant Deborah Jenkins, the school's principal, "looked [Lewis] up and down" and stated, "I don't think that you're going to make it." (3d Am. Compl. ¶ 7.) Lewis responded, "it will be ok, I'll pray about it." (*Id.*) To this, Jenkins replied: "What are you

---

[1] In their "Corrected Motion for Summary Judgment" Defendants say that they "hereby move[] for summary judgment, pursuant to Fed. R. Civ. P. 12(b)(6)." (Dkt. 51, Defs.' Mot. to Dismiss at 1.) The Court recognizes that, in Michigan's courts, defendants may seek "summary disposition." In the federal courts, however, there is no procedural device by that name. Instead, a party may seek "summary judgment" pursuant to Federal Rule of Civil Procedure 56 or dismissal for "failure to state a claim upon which relief can be granted" pursuant to Federal Rule of Civil Procedure 12(b)(6). The substance of Defendants' motion makes plain that they proceed under the latter rule and so the Court does the same.

2

going to do[,] pray that I die[?]" (*Id.*) Lewis says that school administrators heard the exchange and laughed. (*Id.*)

That same day, Alice Williams, then a teacher at MLK High, remarked, "I know Dr. Jenkins didn't hire you because she only wanted younger teachers working here." (3d Am. Compl. ¶ 7.) Williams and another teacher who was present then "informed [Lewis] about not dressing old." (*Id.*) At the end of the school year, Williams was transferred to a different high school. (*Id.*)

Despite these  first-day comments, Lewis continued in her teaching position through the 2010-2011 school year. In May and June 2011, demolition was taking place at MLK High in preparation for a new facility. (*See* 3d Am. Compl. ¶ 6.) Lewis says that she and some of the MLK High students were exposed to asbestos and suffered "severe pain with headaches, major chest pain, [and] breathing problems." (*Id.*) She "informed administrators and [the] union representative of the construction work" but "[n]othing was done about it." (*Id.*) Lewis underwent "emergency sinus surgery due to severe pain in July 2011." (*Id.*)

*Conflicts with Principal Jenkins at the Start of the 2011-2012 School Year*

The 2011-2012 school year also did not start well for Lewis. During August 2011, Jenkins interviewed teachers for her position. (3d Am. Compl. ¶¶ 5, 8.) Then, on September 7, 2011, Jenkins interrupted Lewis' class. (*See* 3d Am. Compl. ¶ 5; 3d Am. Compl., Ex. D at Pg ID 1120.) Jenkins asked why Lewis' students were not working on the computers; Lewis explained that the cords were misplaced. (3d Am. Compl., Ex. D at Pg ID 1120.) Jenkins and Lewis had a verbal exchange about moving broken computers onto the floor. (*Id.*) Jenkins then started "disrespecting" Lewis by stating that Lewis was "a technology teacher" and "need[ed] to make it happen." (*Id.*) After further discussion, Jenkins became "angry" and asked Lewis "to go into the hallway." (*Id.*) Once there,

Jenkins reminded Lewis of her remark from the first day of school—that Lewis would not make it at the school—and told Lewis that she did not want Lewis in her building. (*Id.*) Jenkins also stated that Lewis "dress[ed] the part but [was] not all that." (*Id.*) Lewis says, "I asked her why she disrespecting me and she stated that 'I will show you disrespect, come to my office at the end of class.'" (*Id.* (internal quotation marks added).)

After class, Lewis went to Jenkins' office. (3d Am. Compl., Ex. D at Pg ID 1120.) There, Jenkins banned Lewis from all programs and again said that she did not want Lewis in her building. (*Id.*) According to Lewis, "She told me that she put Indira Murray (from Eastern Michigan) in the system to do my job and that she wants Ms. Alice Williams back and she never wanted me in the first place." (*Id.*) Lewis told Jenkins that this was "not the way to do things," but Jenkins insulted Lewis (e.g., "you think you look good but you don't") and asked her secretary to come into her office while she continued to yell at Lewis. (*Id.*; 3d Am. Compl. ¶ 5.) Lewis asked what the real problem was, and "[Jenkins] stated that her vision is for the students to learn animation and video game design not introduction to computers." (3d Am. Compl., Ex. D at Pg ID 1120.) Lewis explained that, despite turning in her lesson plans and syllabus, no one had informed her of teaching animation or game design. (*Id.*) Lewis, however, offered to start doing so immediately. "[Jenkins] replied, 'how will you do this when you don't even have working computers,' and laughed. Then [Jenkins] stated, 'just get out of my office, we will see what happens.'" (*Id.* (internal quotation marks added).) Lewis returned to her classroom. (3d Am. Compl., Ex. D at Pg ID 1120.)

A second incident with Jenkins occurred two days later. On September 9, 2011, Jenkins' secretary delivered a letter to Lewis in her classroom; it stated that Lewis was to meet with Jenkins immediately and that Lewis should bring a union representative to accompany her. (3d Am. Compl.,

4

Ex. D at Pg ID 1121.) In Lewis' words, when she arrived at Jenkins' office with a representative, "Dr. Jenkins informed us that she brought me here to come to some agreement but now she doesn't know if she will work with me because she found out that I spoke to the children and other staff concerning our dispute." (*Id.*) Jenkins told Lewis that she had contacted human resources, the assistant superintendent, and legal aid. (*Id.*) Jenkins had also called security. (*Id.*) When security arrived and asked for an explanation, Jenkins stated that she wanted Lewis out of the building; Lewis responded that Jenkins was threatening to ruin her career. (*Id.*) In Lewis' words, "security asked me if I feel safe in this building, I stated yes, I feel safe but [Dr. Jenkins] is harassing me telling me that she has [two former teachers] get[ting] whatever they can and put it in my file so she can get rid of me." (*Id.*; *see also* 3d Am. Compl. ¶ 9.) The security officer and union representative asked Lewis to go to another room.  (3d Am. Compl., Ex. D at Pg ID 1121.) The pair eventually spoke with Lewis, and then directed Lewis to return to her class. (*Id.*)

Later that Friday, as Jenkins was walking in the halls with DPS Assistant Superintendent Derrick Coleman, Jenkins asked Lewis to come and speak with her. (3d Am. Compl., Ex. D at Pg ID 1121.) Although Lewis responded that she first needed a union representative, Jenkins informed Lewis that the person accompanying her was Assistant Superintendent Coleman. (*Id.*) Coleman offered to meet with Lewis the following Monday. (*Id.*)

Still later on September 9, "a gentleman" changed the locks to Lewis' classroom, and Lewis "was not given a key to get back in for several days." (*Id.*)

On September 9, and again on September 12, 2011, Lewis filed grievances with her union. (3d Am. Compl. ¶ 8.) Lewis says that after she filed the grievances, "the union got involved" and Jenkins told two over-50-year-old teachers—teachers that Jenkins had "harassed and threatened to

remove" a month earlier—that "she will get back to them." (*Id.*) Jenkins ultimately forced one of these two teachers to retire; Jenkins required the other to sign "a document," which Jenkins held to keep the teacher in fear of losing her job. (*See id.*) Lewis says, "[I] advised both teachers . . . to go to Human Resources but [I] didn't know that they were going to work with [Jenkins] and retaliate against [me] and the employees. [Both teachers] tried to file a complaint with human resources but human resources would not assist them." (*Id.*)

On September 12, 2011, Jenkins drafted a letter to Lewis; the subject was "Written Reprimand." (3d Am. Compl., Ex. E at Pg ID 1126.) The letter stated that Lewis had violated four "Work Rules." (*Id.*) For example, "Work Rule 10: Teacher was asked to obtain assistance with the non-working computers in her classroom. Teacher became loud and confrontational following an inquiry about the non-working computers in her assigned classroom." (*Id.*)

Following Jenkins' reprimand, on September 19, 2011, and again on September 27, Lewis sent emails to Detroit Public Schools Emergency Manager Roy Roberts. (3d Am. Compl., Ex. D at Pg ID 1119.) In the first, Lewis wrote, "I am writing to inform you of the mistreatment that is going on at my place of work. Please take a brief moment of your time to read [the attached] letter . . . concerning Dr. Deborah Jenkins (Principal of [MLK High]) and I. I also have witness statements and other documents that I will turn in to you tomorrow." (*Id.*) And in the second:

> On Wednesday, September 14, 2011, Dr. Jenkins stated that she was going to get me out of this building . . . . On September 27, 2011, Dr. Jenkins came by my room with another woman . . . and pointed at me and stopped the woman from waving and coming into my room. Every time [Dr. Jenkins] sees me she has something to say negative towards me. . . .

(3d Am. Compl., Ex. D at Pg ID 1121.) Regarding Jenkins' reprimand, Lewis explained to the Emergency Manager:

6

> I spoke to [Assistant Superintendent] Coleman on . . . September 20,
> 2011 . . . and he informed me that he spoke to human resources and
> they stated that there is nothing in my file, but I received a letter of
> intimidation from Dr. Jenkins which was a written reprimand . . . and
> cc: . . . personnel file. Mr. Coleman assured me that nothing was in
> my file. So, why is [Dr. Jenkins] making false accusations towards
> me sending . . . threatening letters[?] I would like to meet with you
> concerning this matter.

(*Id.*)

On September 29, 2011, a representative from the Detroit Federation of Teachers (i.e., Local 231 of the American Federation of Teachers) sent a letter to Jenkins regarding the reprimand. (3d Am. Compl., Ex. E at Pg ID 1125.) The union representative told Jenkins that, in sending the reprimand letter to Lewis, she had not complied with the union's contract with DPS. (*Id.*) The representative demanded that the "written reprimand . . . be rescinded and all files . . . cleared of this matter." (*Id.*)

### *Gas Leak at MLK High in September and October 2011*

Lewis claims that when the new MLK High building opened for classes in the fall of 2011, it was not completely ready for use. (*See* 3d Am. Compl. at 14.) In particular, Lewis says that there was a gas leak at the new facility. Lewis was "affected by the gas fumes from . . . September 26-29, October 4-18, 2011." (3d Am. Compl. ¶ 11.) The gas caused students to suffer from "headaches and stomach aches." (*Id.*) Lewis says that on one occasion, a teacher brought a student into her classroom because the student had vomited; Lewis informed the teacher that she had also vomited that day. (*Id.*)

Building contractors reported turning the gas off on October 7, 2011. (3d Am. Compl. ¶ 11.) Around this time, Lewis notified a visiting fire department lieutenant about the problem. (3d Am. Compl. ¶ 11.) The lieutenant informed Lewis that the construction company had been "cited for

damaging gas pipelines." (*Id.*) The lieutenant also told Lewis that he had "checked room D214 and the gas was turned off." (*Id.*) Lewis responded, "come in the morning and you will smell it better." (*Id.*)

From October 10 to October 12, 2011 the gas fumes made Lewis sick. On the 10th, Lewis informed the "in-school building representative that the gas [was] still coming out in the D200 section." (3d Am. Compl. ¶ 12.) That day, a teacher informed Lewis that she had to miss a week of work because of the fumes. (*Id.*) "[A]t the beginning of the [next] day, gas was everywhere." (*Id.* ¶ 13.) And Lewis continued to smell gas on October 12. (*Id.*) On the 13th, Lewis called in sick to work and went to her doctor for headaches, anxiety, and breathing problems. (*See id.* ¶ 16.)

On October 14, 2011, Lewis sent an email to Grace Wirth, apparently the Secretary to the Director of Human Resources in the Michigan Department of Education. (3d Am. Compl., Ex. D at Pg ID 1120); *see* Michigan Department of Education Directory, http://www.michigan.gov/documents/Education_121921_7.pdf (last visited Sept. 9, 2013). (Incidentally, Lewis also copied the email to Governor Rick Snyder and DPS Emergency Manager Roy Roberts. (*Id.*)) The letter recounted the "bullying and psychological harassment by Dr. Deborah Jenkins." (*Id.*) On this topic, Lewis asserted,

> Every complaint that is made has either been covered up by [Dr. Jenkins'] friends in human resources and now I have just reasons to believe that any information that I give to labor relations and employee relations have been tampered with. After I reported a second harassment claim to Tanisha Harris, in employee relations, this information was given to Dr. Jenkins within one hour. This is only a tactic to harass any witness involved in advance.

(*Id.*; *see also* 3d Am. Compl. ¶ 18.) As for the gas leak, Lewis' letter provided:

> Dr. Jenkins is not properly taking care of serious levels of gas fumes on a daily basis. Staff and students are throwing up, and getting light

8

> headed every other day because no one wants to take care of the problem until [third or fourth] hour. These fumes are coming from the science room located in the D200 section. The principal is jeopardizing students and staff safety by not taking care of this serious problem.

(3d Am. Compl., Ex. D at Pg ID 1120.)

A day later, on October 15th, Lewis emailed DPS Employee Relations Executive Director Lauri Washington about "the possible deception in her department." (3d Am. Compl. ¶ 19.) The email was copied to Wirth and the new DPS Assistant Superintendent, Alvin Wood. (*Id.* ¶¶ 16, 19; *id.*, Ex. AA at Pg ID 1315.) In response, "Wood stated that he [was] very aware of everything going on at King High School regarding [Lewis] and charges against Dr. Jenkins." (*Id.* ¶ 16.) (Although omitted from the Third Amended Complaint, Lewis' original complaint provides, "On October 18, 2011 . . . Ms. Lauri Washington replie[d] back by stating that 'I have discussed this matter with Ms. [Tanisha] Harris. She denies your recitation of facts/events in this case. Furthermore your statement of deception are specifically denied and are totally fabricated.'" (Dkt. 1, Compl. ¶ 15 (internal quotation marks added).))

On October 18, 2011, a physician "took [Lewis] off work due to stress, depression, and severe headaches." (3d Am. Compl. ¶ 17.) And on November 9, 2011, Lewis sought medical treatment for "severe headaches, ear infection and breathing problems." (*Id.*)

Although the Third Amended Complaint does not specify the dates, Lewis informed MLK High's "daily security," "other administrators," "building contractors," and Assistant Principal Kenyuano Jones of the gas leak. (3d Am. Compl. ¶ 15.) According to Lewis, "Jones refused to move [my] classroom and he stated he already knows about the gas and continue to harass [me]. [I] had a napkin or a scarf over [my] nose while teaching class." (*Id.*)

9

*Alleged Conspiracy to Deprive Lewis of her Employment Benefits*

On October 19, 2011, the day after her doctors took her off work, Lewis applied for leave pursuant to the Family and Medical Leave Act and for worker's compensation. (3d Am. Compl. ¶ 26; *see also* Dkt. 46, Pl.'s Resp. to Defs.' Misfiled Mot. to Dismiss at 6.) Although the theory is not clearly articulated, Lewis apparently believes that Jenkins conspired with Washington or others to deny her paid leave and worker's compensation.

Specifically, on November 15, 2011, Lewis went to see Clarence Jones, the manager of the Worker's Compensation Department in DPS' Office of Risk Management. (3d Am. Compl. ¶ 20; *see also id.*, Ex. K at Pg ID 1159.) Jones told Lewis that "the reason why [her] workmen's [compensation] was held up was due to something . . . with labor relations and that Lauri[] Washington is going to get back with Ruth Smith." (*Id.* ¶ 20.)

On December 5, 2011, Lewis emailed Washington, Smith, and Leave Manager Debra Dotson. (3d Am. Compl. ¶ 24.) Lewis stated, "I am writing to find out why I am not being paid benefits. I have contacted you as well as my doctors on the hardship that this has caused me. As you well know, my doctor has taken me off work . . . ." (*Id.*)

That same day, Dotson responded to Lewis' leave request. (3d Am. Compl. ¶ 25.) Dotson informed Lewis that she had been granted paid leave from October 18 to October 25, 2011 and unpaid leave through January 9, 2012. (*Id.*) Lewis replied: "I was also told by Mr. Clarence Jones . . . that my workmen's compensation was being held up because Lauri Washington spoke to . . . Ruth Smith and stated to hold off until further information. Can you explain to me why? My doctor has informed you and all parts that I am totally disable[d] and yet I have not received any information or compensation." (3d Am. Compl., Ex. K at Pg ID 1158.) Although the reason for her

revelation is unclear (and unsupported), Lewis' Third Amended Complaint provides, "This was when I realized the deception and how they got to Clarence Jones to sabotage my benefits." (3d Am. Compl. ¶ 26.)

As Lewis had copied Jones on the email to Dotson, Jones responded in an attempt to clarify what he had told Lewis on November 15:

> Ms. Lewis,
>
> Your statement is not totally accurate. I did state that your request/claim for workers compensation benefits would actually be denied. The main reason was that we did not have sufficient medical [records?] from your doctor the day you entered my office. You only had a disability slip in your hand. . . . I never mentioned anything about your paperwork being held up in regards to any type of conversation between Ms Smith or Ms Washington.

(3d Am. Compl., Ex. K at Pg ID 1157.) Lewis replied and maintained her account of what Jones had said; Jones then emphasized, "Please note at Risk Management/Workers Compensation can only comment on your file here in our office. Our decision on your case file has nothing to do with Lauri Washington or Ms[.] Debra Dotson." (3d Am. Compl., Ex. K at Pg ID 1159.)

On December 11 and December 12, 2011, Lewis was hospitalized for "depression and stress." (3d. Am. Compl. ¶ 32.) Lewis was again hospitalized from January 25 to January 28, 2012 "for heart problems from stress." (*Id.*)

*Washington Responds to Lewis' Complaints About Jenkins and the Gas Leak*

Lewis believed that Kenyuano Jones, one of Jenkins' "Assistant Principals," refused to move her classroom away from the gas and harassed her, including by taking computers from her classroom. (3d Am. Compl. ¶¶ 15, 31.)  But in January 2012, DPS Employee Relations Executive Director Washington "found the allegations of discrimination and harassment not substantiated

towards Kenyuano Jones[.]" (3d Am. Compl. ¶ 31.)

*Lewis' Occupational Safety and Health Administration Complaints*

On December 28, 2011, Lewis filed a complaint about the gas leak with the Federal Occupational Safety and Health Administration; this led to Michigan's Occupational Safety and Health Administration's ("MIOSHA") involvement. (3d Am. Compl. ¶ 33; *see also id.*, Ex. G at Pg ID 1142).

In January 2012, MIOSHA sent DPS' Executive Director of Auxiliary Services, Felicia Venable-Akinbode, a letter regarding Lewis' health and safety complaint. According to the letter, Lewis' complaint alleged that gas made employees sick to the point of "headaches, shortness of breath, and vomiting," that "[t]eachers were taking off work and going to the doctors for treatment[]," and that "[s]ome employees were off work without pay, and some teachers have been written up for complaining about the situation." (3d Am. Compl., Ex. G at Pg ID 1142.) Instead of conducting its own investigation, MIOSHA requested that Venable-Akinbode "investigate the alleged conditions," "make any necessary corrections," and apprise MIOSHA of the results. (*Id.*)

On March 19, 2012, Venable-Akinbode responded to MIOSHA. (3d Am. Compl., Ex. G at Pg ID 1144-45.) The DPS auxiliary services director explained that an industrial hygienist for DPS assessed the air quality and, among the areas tested, only found a foul odor in Room B206. (*Id.* at Pg ID 1144.) Follow-up investigation revealed that the foul order was due to a "faulty floor drain trap primer"; DPS had replaced the primer, the foul odor had dissipated. (*Id.* at Pg ID 1145.) Venable-Akinbode further explained that after a second inspection, "[a]ll test parameters were within [American Society of Heating, Refrigerating and Air-Conditioning Engineers] and MIOSHA recommended standards." (*Id.* at Pg ID 1146.) Venable-Akinbode added, "As for allegations of staff

taking off work without pay and some having been disciplined for complaining about the situation was determined [*sic*] to be without merit after I personally discussed the allegations with the school administrator, Dr. Deborah Jenkins." (*Id.*)

Because MIOSHA did not sample in the areas where Lewis believed gas was present, and because a teacher informed Lewis that he had smelled gas on April 2, 2012, Lewis filed a second occupational health and safety complaint on April 4. (*See* 3d Am. Compl. ¶ 34; *id.*, Ex. G at Pg ID 1149; *id.*, Ex. M at Pg ID 1165-70.) And on April 13, April 16, and April 18, 2012, Lewis, conducting her own investigation into the gas leak, visited the "health depart[ment]," a "childrens hospital," and the Detroit Fire Department. (3d Am. Compl. ¶ 34.) Captain Robin Eagan of the Fire Department called Venable-Akinbode to inquire about the gas leak; when Venable-Akinbode denied the leak, Eagan stated that she would go to the school herself. (*Id.*)

Lewis claims that her independent investigation paid off. (3d Am. Compl. at 15.) On April 20, 2012, "major gas leaks were found inside the building causing customer teachers [*sic*] and students to become ill from [the] [g]as [f]umes." (3d Am. Compl. ¶ 36.) The DTE Energy Company "verified" the gas leak and "fixed it, but the fire department remained in the building because gas fumes and other foul ordors [were] still leaking." (*Id.*)

The same day, April 20, MIOSHA sent Venable-Akinbode a letter regarding Lewis' second health and safety complaint. The letter reflects that, as compared to her first complaint, Lewis made more specific allegations:

> 1. A gas leak occurred on April 2, 2012, in Room D217.
>
> 2. Over the last year gas fumes were coming from the science room, D214.
>
> 3. A gas fume in the building was making employees sick; teachers

13

were having headaches, shortness of breath, and vomiting. These
employees work in rooms D105, through, D218.

(3d Am. Compl., Ex. G at Pg ID 1149; *see also id.*, Ex. M at Pg ID 1165-70.) As before, MIOSHA

requested that Venable-Akinbode investigate and provide MIOSHA with the results. (*Id.*)

*Coda*

Lewis filed this suit on April 25, 2012. Although the above summary is already lengthy,

three after-arising events, alleged in the Third Amend Complaint, complete the factual picture.

*First*, on May 14, 2012, DPS responded to MIOSHA's letter regarding Lewis' second

complaint. (3d Am. Compl., Ex. G at Pg ID 1151-53.) DPS informed that it conducted air-quality

investigations on April 17, April 26, and May 14, 2012 (although the first date preceded Lewis

second complaint, the investigation was based on an earlier complaint to the Detroit Department of

Health and Wellness). (*Id.* at Pg ID 1151.) On April 17, "[n]o natural gas odor was detected inside

the building." (*Id.*) But a "very faint" natural-gas odor was detected "near the gas meter outside the

building." (*Id.* at Pg ID 1151-52.) On the 26th, further samples were taken, and teachers from several

rooms—including D214 and "science room D215"—said that they had not recently smelled any

"foul odor." (*Id.* at Pg ID 1152.) The science-room teacher in D215 provided that when school

started in the fall, there was a "very faint odor similar to dead animals," but after he "poured water

down the floor drains," "the smell went away." (*Id.*) Similarly, "some students [from D214]

mentioned that there was a faint odor in the classroom some time ago." (*Id.* at Pg ID 1153.) DPS

further informed that, as of the 26th, DTE Energy Company had tested the outside gas meter "and

repaired the leak." (*Id.* at Pg ID 1152.) Further air sampling and teacher surveying, including of

Room "D215 A & B" was done on May 14. (*Id.* at Pg ID 1152-53.) Save for two rooms, D118 and

B111, "[a]ll test parameters were within [American Society of Heating, Refrigerating and

Air-Conditioning Engineers] and MIOSHA recommended standards." (*Id.* at Pg ID 1153.) As to

D118 and B111, DPS informed MIOSHA that it had recommended "to the engineer to increase the

outside air supply to these rooms." (*Id.*)

    *Second*, on June 28, 2012, the EEOC responded to a charge Lewis filed on February 13,

2012. (3d Am. Compl. at Pg ID 1173.) In her charge, Lewis asserted,

> On September 7, 2011, I was harassed by my Principal and
> threatened with removal. Two days later my Principal tried to have
> security and the Assistant Superintendent escort me out of the
> building, but they refused. On September 12, 2011, September 29,
> 2011, and October 4, 2011 I informed Labor Relations/Employee
> Relations that my Principal was harassing me and trying to have me
> removed and replaced by a younger teacher. On October 18, 2011, I
> was put on a leave of absence by the school district. As of this point
> my employer has not done anything to correct this harassment. I feel
> I have been harassed in Retaliation for complaining to Employee
> Relations about harassment and Age discrimination.

(3d Am. Compl. at Pg ID 1172.) In its June 2012 response, the EEOC informed that it was "unable

to conclude that the information obtained establishes violations of the statutes." (*Id.* at Pg ID 1173.)

    *Third*, it appears that after October 18, 2011, Lewis never returned to work for DPS. (*See*

Compl. ¶¶ 37-38.) In March 2012, Dotson informed Lewis that her requested FMLA extension had

been denied pending an independent medical evaluation or a "[s]econd/[t]hird" medical opinion. (3d

Am. Compl., Ex. Q at Pg ID 1180.) In April 2012, Lewis received a letter sent to all DPS teachers;

it informed Lewis that due to DPS' "continuing financial emergency," DPS was "reducing its work

force." (3d Am. Compl., Ex. T at Pg ID 1190.) The letter continued, "Therefore, this communication

serves as your official notice of layoff effective the end of the day on Friday, August 24, 2012.

However, please be informed that commencing May 2012, Detroit Public Schools will hold

interviews for all teaching positions for the upcoming school year." (*Id.*) Lewis says that Dotson

called her on May 9, 2012 and "harass[ed] her to return to work" despite that an independent medical examiner had recommended a transfer. (3d Am. Compl. ¶ 37; *see also id.*, Ex. U at Pg ID 1192.) Although a copy of the letter is not included with the Third Amended Complaint, Lewis says that on May 17, 2012, DPS informed her that it would proceed to terminate her employment unless certain actions were taken by May 24, 2012. (3d Am. Compl. ¶ 38.) Lewis' last day with DPS was August 31, 2012. (Dkt. 65, Pl.'s Mot. TRO at 1.)

## II.

In resolving a defendant's motion to dismiss a plaintiff's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6), this Court applies the now-familiar plausibility standard set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) and *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss under Rule 12(b)(6), a plaintiff must plead "sufficient factual matter" to state a claim to relief that is "plausible on its face." *Iqbal*, 556 U.S. at 678. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* Although the plausibility standard is not a "probability requirement," plausibility requires "more than a sheer possibility that a defendant has acted unlawfully." *Id.* Ultimately, determining whether a complaint states a plausible claim for relief is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Id.* at 679.

## III.

Lewis says that she has pled a prima facie case of "retaliatory discrimination under Title VII." (3d Am. Compl. at 2.) But Title VII of the Civil Rights Act of 1964 prohibits discrimination based on "race, color, religion, sex, or national origin." 42 U.S.C.A. § 2000e-2. Nonetheless,

16

because this Court liberally construes legal claims drafted by pro se litigants such as Lewis, *see Erickson v. Pardus*, 551 U.S. 89, 94 (2007), the Court assumes, in Lewis' favor, that she intended to plead both a disparate-treatment claim and a retaliation claim pursuant to the Age Discrimination in Employment Act of 1967. (*See* 3d Am. Compl. at 1 (referencing the ADEA along with Title VII and the Civil Rights Act of 1991); *id.* at 2 (citing Supreme Court case for the proposition that disparate-impact claims are cognizable under the ADEA).) Defendants' motion to dismiss also interprets Plaintiff's claims as arising under the ADEA. The factual matter alleged in the Third Amended Complaint does not make either theory plausible. The Court begins with Lewis' disparate-treatment claim.

## A.

### 1.

Defendants say that *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.*, 12 F.3d 1382 (6th Cir. 1993) sets forth the elements that Lewis must plead to state a disparate-treatment claim pursuant to the ADEA. (Dkt. 51, Defs.' Mot. to Dismiss at 10-11.) There, in reviewing the district court's grant of *summary judgment* to the employer, the Sixth Circuit applied the familiar burden-shifting framework first articulated in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Barnhart*, 12 F.3d at 1390. As is relevant to Defendants' argument, the first step of *McDonnell Douglas*' tripartite framework requires a plaintiff to establish a prima facie case of age discrimination: "'(1) membership in a protected group; (2) qualification for the job in question; (3) an adverse employment action; and (4) circumstances that support an inference of discrimination.'" *Blizzard v. Marion Technical Coll.*, 698 F.3d 275, 283 (6th Cir. 2012) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 510 (2002)). Defendants imply that Lewis must plead each of these four elements, and

17

assert that Lewis' disparate-treatment claim must be dismissed because she has not pled an adverse action. (*See* Defs.' Mot. to Dismiss at 11-13.)

Defendants' implication, however, is incorrect: an ADEA plaintiff does *not* have the burden of pleading a *McDonnell Douglas* prima facie case of discrimination in order to state a claim for relief. Indeed, Supreme Court precedent is directly contrary. In *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506 (2002), the Court explained that the Federal Rules did not place a heightened pleading burden on ADEA plaintiffs: "Federal Rule of Civil Procedure 8(a)(2) . . . provides that a complaint must include only 'a short and plain statement of the claim showing that the pleader is entitled to relief.' Such a statement must simply 'give the defendant fair notice of what the plaintiff's claim is and the grounds upon which it rests.'" *Id.* at 512 (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). The Court also noted that it had "never indicated that the requirements for establishing a prima facie case under *McDonnell Douglas* also apply to the pleading standard that plaintiffs must satisfy in order to survive a motion to dismiss." *Id.* at 510. For these and other reasons, the Supreme Court held that "[t]he prima facie case under *McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement." *Id.* at 510.

To be sure, in *Iqbal*, the Court made clear that, to state a claim for relief, a complaint must make plausible that the defendant acted unlawfully. But *Swierkiewicz*'s holding that "*McDonnell Douglas* . . . is an evidentiary standard, not a pleading requirement" remains good law. The Sixth Circuit has held exactly this and reaffirmed that "the *McDonnell Douglas* framework does not apply at the pleading stage." *Keys v. Humana, Inc.*, 684 F.3d 605, 609 (6th Cir. 2012); *accord Serrano v. Cintas Corp.*, 699 F.3d 884, 897 (6th Cir. 2012).

The Court thus looks instead to statutory text. The Age Discrimination and Employment Act

of 1967 makes it unlawful for an employer "to fail or refuse to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." 29 U.S.C. § 623(a)(1). It also prohibits an employer from "limit[ing], segregat[ing], or classify[ing] his employees in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's age." 29 U.S.C. § 623(a)(2). Because of the phrases "compensation, terms, conditions, or privileges of employment," § 623(a)(1), and "deprive any individual of employment opportunities or otherwise adversely affect his status as an employee," § 623(a)(2), the Court agrees with Defendants' conclusion, wrongly reached, that Lewis must plead that her employer took an adverse action against her. *See McKnight v. Gates*, 282 F. App'x 394, 399 (6th Cir. 2008) ("To state a claim under a disparate treatment theory, a plaintiff must allege that 'age was a determining factor in *the adverse action* that the employer took against him or her.'" (emphasis added) (quoting *Phelps v. Yale Sec., Inc.*, 986 F.2d 1020, 1023 (6th Cir. 1993)).

## 2.

An array of actions have been considered "adverse" in the employment discrimination context. These include failing to hire, failing to promote, firing, a significant change in benefits, and reassignments resulting in salary reduction, work-hour changes, a less distinguished title, or "significantly diminished material responsibilities." *Spees v. James Marine, Inc.*, 617 F.3d 380, 391 (6th Cir. 2010). A common thread ties these varied actions together: adverse actions significantly affect employment. *See id.* at 391 ("An adverse employment action has been defined as 'a materially adverse change in the terms and conditions of [a plaintiff's] employment.'" . . . Adverse employment

19

actions are typically marked by a 'significant change in employment status' . . . ." (quoting *White v. Burlington N. & Santa Fe Ry. Co.*, 364 F.3d 789, 795 (6th Cir. 2004) (en banc)); *White*, 364 F.3d at 797 ("A mere inconvenience or an alteration of job responsibilities or a bruised ego is not enough to constitute an adverse employment action." (internal quotation marks omitted)); *Tolliver v. Children's Home-Chambliss Shelter*, 784 F. Supp. 2d 893, 907 (E.D. Tenn. 2011) ("Material adverse employment actions are those that effect 'a significant change in employment status . . . .' Such changes 'must be more disruptive than a mere inconvenience or an alteration of job responsibilities.'" (quoting *Tepper v. Potter*, 505 F.3d 508, 515 (6th Cir. 2007)).

A number of Lewis' allegations are simply not, as a matter of law, "adverse" enough. For example, Jenkins' act of interviewing teachers for Lewis' position—without allegations that even one of these teachers were ever hired and with allegations that Lewis maintained her position after the interviewing—cannot be considered adverse. As another, the fact that the locks were changed on the doors to Lewis' classroom cannot be considered adverse where Lewis was only without a key for "several days" beginning on a Friday and Lewis fails to allege how her job responsibilities were made more difficult because she did not have a key. The case law also makes clear that the written reprimand that Jenkins placed in Lewis' file (ignoring, in Lewis' favor, that Assistant Superintendent Coleman said that the reprimand was not in her file) is not sufficiently "adverse" for purposes of an employment discrimination claim. *See Hearn v. Cnty. of Wayne*, No. 11-15221, 2013 WL 607863, at *8 (E.D. Mich. Feb. 19, 2013) (holding that a "written reprimand and other criticisms, remarks and accusations by supervisors that did not result in discipline" fell outside the "definition of adverse action, inasmuch as they did not result in any change in employment status"); *Andrews v. Lockheed Martin Energy Sys., Inc.*, No. 3:06-CV-42, 2006 WL 2711818, at *11 (E.D.

Tenn. Sept. 21, 2006) ("Conduct that does not amount to a materially adverse employment action includes the following: close supervision, written warnings, reassignments without salary or work hour changes, and a one-day suspension with pay."); *Wedyke v. Potter*, No. 06-14874, 2008 WL 2705501, at *7 (E.D. Mich. July 10, 2008) ("Disciplinary actions such as letters of warning and oral and written reprimands do not normally rise to the level of adverse employment actions without some tangible job consequences").

Lewis has alleged other events, however, that might properly be deemed adverse actions. For one, Lewis claims that Jenkins somehow conspired with people in DPS' Employee Relations Department, Worker's Compensation Department, or Compensation and Benefits Department to deny her paid leave or worker's compensation after she became ill in the fall of 2011. *See Spees*, 617 F.3d at 391 (providing that "a decision causing a significant change in benefits" is an "adverse action"). For another, Lewis says that Jenkins somehow replaced her with Williams, 20 years her junior. *Id.* (providing that "firing" is an "adverse action").

**3.**

But even if these (or other) alleged actions are sufficiently adverse for purposes of a disparate-treatment claim under the ADEA, Lewis' Third Amended Complaint still falls short of adequately pleading that legal theory. This is because her allegations do not make the requisite tie between the claimed adverse actions and the claimed age-based animus. *See* 29 U.S.C. § 623(a) (making it unlawful for an employer to discriminate against its employee with respect to the employee's privileges of employment "*because of* such individual's age" (emphasis added)).

In *Gross v. FBL Fin. Servs., Inc.*, 557 U.S. 167 (2009) the Supreme Court construed the term "because of" in 29 U.S.C. § 623(a) to require "but for" causation:

> We hold that a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the "but-for" cause of the challenged adverse employment action. The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision.

557 U.S. at 180.

Although *Gross* clearly established the burden to *prove* causation in the context of a disparate-treatment claim under the ADEA, there is some disagreement as to the effect that *Gross* had on a plaintiff's burden to *plead* such a claim. In the context of determining whether *Gross*' but-for test precludes pleading alternative theories of discrimination (e.g., that discrimination occurred because of the employee's race as well as age), some courts have declined to extend *Gross*' rule of proof to the pleading stage. For example, in *Chacko v. Worldwide Flight Services*, the plaintiff asserted discrimination based on age, race, and national origin. No. 08-2363, 2010 WL 424025, at *5 (E.D.N.Y. Feb. 3, 2010). The Court reasoned that *Gross* did not preclude such a claim:

> According to Defendant, an ADEA plaintiff must now plead that age was the "but-for" reason for the disputed employment decision. . . . The court disagrees. First, as *Swierkiewicz* makes clear, the pleading requirements of the Federal Rules of Civil Procedure are not identical to the requirements of a prima facie claim of discrimination. *See Swierkiewicz*, 534 U.S. at 514. Second, *Gross* concerned a plaintiff's ultimate burden of proof, as conveyed in a jury instruction. Proof standards are analytically distinct from both pleading requirements and from the elements of a plaintiff's prima facie case.

*Id.* at *4; *see also Brazill v. California Northstate Coll. of Pharmacy, LLC*, 904 F. Supp. 2d 1047, 1051 (E.D. Cal. 2012) ("This court joins the consensus among district courts finding that *Gross*'s application is limited to a plaintiff's burden of persuasion and does not preclude a plaintiff from pleading alternate theories for an adverse employment action.").

22

Lewis, however, has not attempted to plead alternate theories of discrimination. Instead, the question here is whether Lewis has set forth the requisite factual matter to make plausible that the alleged adverse employment actions were "because of" her age. On this inquiry, the Court finds the following pleading standard persuasive:

> The Court does not believe that under *Gross*, an ADEA plaintiff must specifically state in his pleadings that age was the "but for" reason of the alleged adverse employment action. *See* [*Chacko*, 2010 WL 424025, at *4]. Rather, what is required is that the complaint contain sufficient facts to make plausible the conclusion that "but for" his age Plaintiff would still be employed.

*Roginsky v. Cnty. of Suffolk, N.Y.*, 729 F. Supp. 2d 561, 568-69 (E.D.N.Y. 2010); *see also Smith v. CH2M Hill, Inc.*, — F. App'x —, No. 12-15559, 2013 WL 2450833, at *1 (11th Cir. June 5, 2013) ("Smith did not allege sufficient facts to allow us to reasonably infer that [his employers] violated the but-for standard set forth in the ADEA. *See Gross*, 557 U.S. at 177-78; *Iqbal*, 556 U.S. at 678. Therefore, we affirm the district court's dismissal of Smith's age discrimination claim." (some internal citations omitted)); *Payne v. Malemathew*, No. 09-CV-1634, 2011 WL 3043920, at *2 (S.D.N.Y. July 22, 2011) (providing that, under *Gross*, a plaintiff "need not plead but-for causation, but an ADEA complaint must contain sufficient facts to make plausible the conclusion that but for his age, Plaintiff would still be employed." (internal citation, quotation marks, and alterations omitted)); *Goodridge v. Siemens Energy, Inc.*, 276 F.R.D. 540, 542 (N.D. Ala. 2011) ("[A]lthough, after *Gross* (and *Twombly* and *Iqbal*), a plaintiff who brings a claim under the ADEA must allege facts sufficient to support a reasonable inference that age was the 'but for' cause of the adverse employment action challenged under that claim, *Gross* does not in any way limit a plaintiff's ability to plead alternative facts and alternative theories.").

Applying this standard, Lewis' allegations, even when accepted as fact and read under the

light most favorable to her, do not, in the language of *Iqbal* and *Gross*, make "plausible" that Jenkins or other DPS decision-makers took adverse actions against Lewis "because of" her age.

As an initial matter, the Third Amended Complaint has arguably failed to show that Jenkins held animosity toward older teachers. Lewis says that on her first day at MLK High in October 2010, Jenkins, upon looking her "up and down," stated, "I don't think that you're going to make it." It is quite a leap to infer from this statement that Jenkins was referring to Lewis' age; the broader context of Jenkins' remark is unknown and, in view of Jenkins' September 2011 comments about how Lewis dressed, she may well have made the remark because of Lewis' manner of dress. *See 16630 Southfield Ltd. P'ship v. Flagstar Bank, F.S.B.*, — F.3d —, No. 12-2620, 2013 WL 4081909, at *3 (6th Cir. Aug. 14, 2013) ("[Y]ou can't assess the plausibility of an inference in a vacuum. The reasonableness of one explanation for an incident depends, in part, on the strength of competing explanations."). Lewis, however, attempts to shorten the jump by asserting that, on the same day, Williams stated, "I know Dr. Jenkins didn't hire you because she only wanted younger teachers working here." But the basis for this statement is unknown: was this something that Jenkins told Williams or something that Williams inferred from her own observations? *See Geiger v. Tower Auto.*, 579 F.3d 614, 620-21 (6th Cir. 2009) ("Any discriminatory statements must come from decisionmakers to constitute evidence of discrimination."). Lewis also suggests that Jenkins disliked older teachers because, during the summer of 2011, she "harassed and threatened to remove two . . . teachers over the age of 50." But correlation is not causation: the mere fact that Jenkins harassed two teachers who were over the age of 50 does not mean that she harassed those teachers because they were over 50. *See Iqbal*, 556 U.S. at 678 ("Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of

entitlement to relief." (internal quotation marks omitted).) Finally, Lewis says that Jenkins "replaced" her with Williams, who is 20 years her junior. But the "[r]eplacement of an older employee by a younger employee does not, without more, establish a prima facie case of age discrimination." *Olada v. Sprint Commc'ns Co., L.P.*, 992 F.2d 1217 (table), at *1 n.2 (6th Cir. 1993). Thus, within the confines of the Third Amended Complaint, the inference that Jenkins harbored age-related animus is strained.

Even so, the Court does not rest its conclusion on the adequacy of Lewis' disparate-treatment allegations solely on Lewis' arguable failure to plead animus. Additionally, the Third Amended Complaint fails to sufficiently show that "but for" Jenkins' age-related animus, the events that adversely affected Lewis' employment would not have occurred. *See* 29 U.S.C. §§ 623(a)(1), (a)(2); *Gross*, 557 U.S. at 180. This becomes evident by considering each action that was arguably "adverse" to Lewis within the context that the conduct arose.

From late-September through mid-October 2011, Lewis says that gas fumes at MLK High made her sick. In her October 2011 letter to Wirth (Secretary to the Director of Human Resources in Michigan's Department of Education), Lewis stated that Jenkins was "not properly taking care of serious levels of gas fumes on a daily basis," and as a result, "staff and students are throwing up, and getting light headed every other day . . . ."; Lewis continued, "The principal is jeopardizing students and staff safety by not taking care of this serious problem." Even assuming that Jenkins had a strong dislike for older teachers, it is not plausible that Jenkins permitted staff and students to throw up on "a daily basis" and "jeopardiz[ed] students and staff safety" because of that animus. The same conclusion holds for Lewis' claim that Kenyuano Jones failed to move her classroom—including her students—from sickening gas.

25

Lewis says that during November and December 2011, when she began to dispute the denials of her worker's compensation claim and request for paid leave, "[she] realized the deception and how they got to Clarence Jones to sabotage [her] benefits." This statement, however, is too conclusory to allege a conspiracy between Jenkins and those involved in making Lewis' employee-benefit decisions. And there are insufficient other allegations to flesh out the theory.

In her October 2011 email to Wirth, Lewis claimed that her complaints had been "covered up" by Jenkins' "friends in human resources" and that any information Lewis gave to DPS' Employee Relations Department had been "tampered with." But this statement is itself conclusory; in fact, Lewis' only apparent basis for her "tamper[ing]" theory is that Tanisha Harris in Employee Relations provided Jenkins with "information" about Lewis' second harassment complaint within an hour of receiving it. But the mere fact that Harris passed along Lewis' allegations to Jenkins does not warrant the inference that Jenkins had such influence over Harris (or others in Employee Relations) that she felt compelled to deny Lewis her benefits. And, even if the Court assumed that Jenkins and Harris were conspiring against Lewis, Lewis' allegations do not justify the conclusion that they did so "because of" Lewis' age.

Lewis also alleges that Clarence Jones said that her worker's compensation claim had been held up "due to something . . . with labor relations" and, in particular, Lauri Washington. To be sure, Lewis complained to Washington about Jenkins. And so it might be reasonable to infer that Lewis' benefit decisions were delayed pending Washington's investigation. But this is a far cry from inferring that Jenkins improperly influenced Washington's investigation or, further, that she did so "because of" Lewis' age.

Last is Lewis' claim that Jenkins "replaced her with a younger teacher." In particular, Lewis

26

alleges that she was 49 years old when "Defendants terminated her employment," that she was "demoted from the head of [MLK High's] business department and was qualified for the position," and that Jenkins "transferred Alice Williams to [MLK High] to head the business department and teach [Lewis' computer class]." Lewis has also alleged that she is 20 years older than Williams. These allegations, viewed in isolation, might plead a disparate-treatment claim under the ADEA; but when they are viewed alongside other allegations in the Third Amended Complaint, the Court believes that they do not state such a claim.

According to Lewis, she became ill in October 2011 and, for that reason, could not teach the remainder of the 2011-2012 school year. Thus, Jenkins and DPS needed someone to take over Lewis' duties. The mere fact that Jenkins and DPS selected someone significantly younger than Lewis does not, without more, make it reasonable to infer that Jenkins and DPS forced Lewis out of her position so that they could give her position to a younger teacher. Indeed, Williams took over Lewis' position at least a year after the October 2010 age-related remarks. *See Lefevers v. GAF Fiberglass Corp.*, 667 F.3d 721, 724 (6th Cir. 2012) (finding that human resources manager statement, "[t]here are some elderly supervisors that we have to do something with within the next year," was not probative of discriminatory intent because it had been made two years prior to the plaintiff's termination). It is true that the Third Amended Complaint implies that Jenkins' various acts of "harassment" contributed to Lewis' health problems (*see* Am. Compl. ¶¶ 16, 32), which, in turn, caused Lewis to stop teaching and created a teaching vacancy. But, for reasons already provided, Lewis has not shown that any of Jenkins' "harassing" acts, even if they forced Lewis from MLK High, were "because of" Lewis' age. In other words, the allegations in the complaint do not reasonably imply that "but for" Lewis' age, Jenkins would have acted differently toward Lewis.

* * *

In sum, several of the actions taken by Jenkins and DPS cannot, as a matter of law, be considered "adverse" within the context of a disparate-treatment claim under the ADEA. Other alleged actions likely cross that threshold, but Lewis has failed to adequately plead that Jenkins or other DPS personnel harbored animus toward older teachers. Additionally, the Third Amended Complaint fails to make plausible that "but for" Lewis' age, i.e., but for Jenkins' (or other DPS decision-makers') age-related animus, the adverse actions would not have occurred. For these reasons, Lewis has not adequately pled that Jenkins or DPS is liable for disparate-treatment under the ADEA.

**B.**

In addition to making it unlawful for an employer to treat its employees differently because of their age, the ADEA prohibits an employer from retaliating against an employee because the employee opposed the employer's age discrimination. As noted, Lewis has attempted to plead such a claim. As with Lewis' disparate-treatment theory, however, the Court believes that the Third Amended Complaint fails to set forth factual matter showing that Jenkins (or any other DPS employee) retaliated against Lewis "because" Lewis complained of Jenkins' age discrimination.

**1.**

The Court begins by establishing Lewis' burden to plead causation. The ADEA's anti-retaliation provision makes it "unlawful for an employer to discriminate against any of his employees . . . because such individual . . . has opposed any practice made unlawful by this section." 29 U.S.C. § 623(d). It appears that neither the United States Supreme Court nor the Sixth Circuit Court of Appeals has interpreted the term "because" as used in this provision of the ADEA. Given

28

the history of litigation surrounding Title VII and the ADEA, two possibilities stand out. On the one hand, "because" could require only that a plaintiff show that her opposition to the defendant's age discrimination was "a motivating factor" in the defendant's decision to retaliate. On the other hand, § 623(d) could be understood to require a plaintiff to show that "but for" her opposition to the defendant's discrimination, the defendant would not have retaliated. Supreme Court precedents strongly imply the latter interpretation.

As noted above, the Supreme Court in *Gross* held "that a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove . . . that age was the 'but-for' cause of the challenged adverse employment action." 557 U.S. 167, 180 (2009). The Court found significant that Title VII's prohibition on disparate-treatment included "motivating factor" language whereas the ADEA's comparable clause did not. And "[m]aking this difference in language particularly salient was the reality that Congress amended both statutes in 1991, but added the 'motivating factor' language only to Title VII, not to the ADEA." *Lewis v. Humboldt Acquisition Corp., Inc.*, 681 F.3d 312, 318 (6th Cir. 2012) (en banc) (internal citations omitted).

Thus *Gross* almost answers the present inquiry. Still, the ADEA's anti-retaliation provision was not before the Court. And, notably, that provision uses causation language that differs slightly from the Act's disparate-treatment clause:

> It shall be unlawful for an employer to discriminate against any of his employees . . . *because* such individual . . . has opposed any practice made unlawful by this section, or *because* such individual . . . has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or litigation under this chapter.

29 U.S.C. § 623(d) (emphasis added); *cf.* 29 U.S.C. § 623(a) (prohibiting discrimination against an employee "because of" the employee's age). And this difference in language left open claims that

29

the causation standard under § 623(d) differed from that of § 623(a). *E.g., Fried v. LVI Servs., Inc.*, 500 F. App'x 39, 41-42 (2d Cir. 2012) (declining to resolve plaintiff's argument that *Gross*' but-for-causation standard did not extend to anti-retaliation claims under the ADEA).

The Court believes, however, that any such argument is likely now foreclosed. Last term, in *University of Texas Southwestern Medical Center*, 133 S. Ct. 2517 (2013), the Supreme Court returned to Title VII's causation requirements—this time in the context of its anti-retaliation provision.  That provision, in language virtually identical to the anti-retaliation provision in the ADEA, states:

> It shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . *because* he has opposed any practice made an unlawful employment practice by this subchapter, or *because* he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter.

42 U.S.C. § 2000e-3(a) (emphasis added); *cf.* 29 U.S.C. § 623(d) (quoted above). Interpreting this language, the Court held that, under § 2000e-3(a), an employee must "establish that his or her protected activity was a but-for cause of the alleged adverse action by the employer." *Nassar*, 133 S. Ct. at 2534.

*Gross* and *Nassar* dictate that a plaintiff making a claim of retaliation pursuant to the ADEA, 29 U.S.C. § 623(d), must prove that his or her protected activity was the but-for cause of an alleged adverse action by the employer. *Gross* held that a disparate-treatment provision in the same act now in question, the ADEA, required but-for causation; *Nasser* held that an anti-retaliation provision in another statute, but with language virtually identical to that now in question, also required but-for causation. Any remaining doubt is resolved by the reasoning supporting these two holdings. In both cases, the Supreme Court found significant that in contemporaneously amending Title VII and the

30

ADEA, Congress provided the "a motivating factor" standard in only Title VII's disparate-treatment provision. *Gross*, 557 U.S. at 177 ("Congress amended Title VII to allow for employer liability when discrimination 'was *a motivating factor* for any employment practice, even though other factors also motivated the practice,' 42 U.S.C. § 2000e–2(m) (emphasis added), but did not similarly amend the ADEA . . . . We must give effect to Congress' choice."); *Nassar*, 133 S. Ct. at 2532 ("Congress inserted [the "a motivating factor" language] within the section of the statute that deals only with [discrimination on the basis of race, color, religion, sex, national origin], not the section that deals with retaliation claims or one of the sections that apply to all claims of unlawful employment practices."). Accordingly, this Court concludes that an employee asserting a claim that her employer retaliated against her in violation of the anti-retaliation provision of the ADEA, 29 U.S.C. § 623(d), must show that the retaliation would not have occurred "but for" her opposition. *See also Barton v. Zimmer, Inc.*, 662 F.3d 448, 455 (7th Cir. 2011) ("Under the ADEA retaliation must be a but-for cause of a materially adverse action, not merely a contributing factor.").

This conclusion, coupled with this Court's discussion about a plaintiff's burden to plead causation to state a disparate-treatment claim, dictates that Lewis' Third Amended Complaint must contain enough factual matter to make it plausible that "but for" Lewis' opposition to Jenkins' age discrimination, Lewis would not have suffered the alleged adverse actions.

## 2.

Lewis has not adequately pled that but for her grievances or other challenges to  Jenkins' discrimination against older teachers, the alleged adverse employment actions would not have occurred. This becomes apparent by separating the inquiry into three steps: (1) determining when Lewis engaged in conduct that the ADEA protects, (2) defining the set of possible retaliatory acts

31

that occurred after Lewis engaged in protected conduct, and (3) evaluating whether the Third Amended Complaint sufficiently ties the adverse actions to the protected conduct.

Drawing reasonable inferences in Lewis' favor, Lewis first engaged in conduct protected by ADEA in early September 2011. The Third Amended Complaint provides that Lewis grieved Jenkins to her union on September 9 and September 12, 2011. Notably, however, Lewis has not pled whether these two grievances alleged age discrimination or only non-age-based harassment. In her February 2012 charge to the EEOC, Lewis said, "[o]n September 12, 2011, September 29, 2011, and October 4, 2011 I informed Labor Relations/Employee Relations that my Principal was harassing me and trying to have me removed and replaced by a younger teacher." It also appears that Lewis filed another charge with the EEOC, but the complaint does not say when it was filed or when anyone at DPS learned of it. Viewing these allegations under the light most favorable to Lewis, the Court infers that Lewis engaged in conduct shielded by the ADEA as early as September 9, 2011, the date of Lewis' first complaint about Jenkins.

The next task is to identify the possible adverse acts after September 9, 2011. After a careful review of Lewis' Third Amended Complaint, the Court believes that the following acts could qualify: (1) Jenkins' reprimand on September 12, 2011, (2) Kenyuano Jones' refusal to move Lewis' classroom away from the gas leak sometime in the fall of 2011, (3) the denial of Lewis' employment benefits, and (4) Jenkins' decision to give Lewis' teaching position to Williams.

For reasons similar to those provided above when analyzing the sufficiency of Lewis' disparate-treatment allegations, the Third Amended Complaint does not make plausible that any of these four events would not have occurred "but for" Lewis' opposition to Jenkins' age discrimination. The Court has already reasoned that Jenkins' reprimand was most likely triggered

32

by the dispute between her and Lewis on September 7 and September 9, 2011. To be sure, close temporal proximity between protected conduct and adverse action supports an inference of retaliation. *See Vereecke v. Huron Valley Sch. Dist.*, 609 F.3d 392, 401 (6th Cir. 2010) ("[O]n a particular set of facts, extremely close temporal proximity could permit an inference of retaliatory motive . . . ."). But the problem with this theory is that Lewis has not alleged that Jenkins was even aware of Lewis' September 9 or September 12, 2011 grievances when she authored the reprimand on September 12.

The Third Amended Complaint also fails to show that Jones refused to move Lewis' classroom away from the gas leak at MLK High in retaliation for Lewis' complaints of age discrimination. First, Lewis has not alleged when or how Jones became aware of her grievances about age discrimination. Second, even if the Court were to assume a conspiracy between Jenkins and Jones, the Court would have to further infer that Jenkins was so motivated to retaliate against Lewis that she not only wanted to make Lewis sick, but wanted to do so at the expense of the children in Lewis' classroom. But nothing in the Third Amended Complaint suggests that Jenkins held such animosity toward Lewis "because" Lewis grieved her conduct.

The complaint also does not show that Jenkins had such influence over individuals in DPS' Employee Relations Department, Worker's Compensation Department, or Compensation and Benefits Department that those individuals obliged Jenkins' desire to retaliate by denying Lewis benefits. And even assuming that Jenkins wielded that type of influence, the Third Amended Complaint does not permit the further inference that Jenkins had done so "because" Lewis complained of Jenkins' age discrimination. To this end, Lewis alleges, "[I] advised both [over-50-year-old] teachers . . . to go to Human Resources but [I] didn't know that [Human Resources was]

33

going to work with [Jenkins] and retaliate against [me] and the employees." But a conclusory claim that DPS' Division of Human Resources "retaliate[d] against" Lewis, without allegations of how or why Jenkins influenced the Division to do so, fails to make plausible a retaliation claim under the ADEA.

Finally, Lewis has not adequately pled a causal connection between her complaints about age discrimination and Jenkins' decision to transfer Williams back to MLK High to fill Lewis' position. To adequately plead this retaliatory replacement theory, Lewis must set forth factual matter that allows the Court to reasonably infer that Jenkins forced Lewis from her position at MLK High "because" Lewis had complained of Jenkins' age discrimination. But the Court has already determined that the Third Amended Complaint does not show that the but-for cause of Jenkins' alleged harassment—Jones' refusal to move Lewis' classroom and DPS' denial of Lewis' employee benefits—was Jenkins' desire to retaliate. It follows that the Third Amended Complaint has not made plausible that Jenkins forced Lewis from her position at MLK High in retaliation for Lewis' complaints of age discrimination.

## C.

Lewis attempts to plead three other three claims; each sound in state law. She asserts that DPS and Jenkins were negligent for "allow[ing] the construction company to work around [her]" thereby "expos[ing] [her] to asbestos" and for failing to stop the gas leak or otherwise ensure that she was not exposed to the fumes from the leak. (*See* 3d Am. Compl. at 13-14.) Second, under the label "Intentional Tort," Lewis asserts that DPS failed to protect her "from harassment; Harassing phone calls; Sabotage of workers compensation; terminating Plaintiffs benefits for telling MIOSHA and the EEOC and then firing Plaintiff." (*Id.* at 15-16.) Lewis further faults DPS for "[a]llowing the

34

construction company to work around [her] exposing [her] to Asbestos and Gas Fumes." (*Id.* at 16.) Lewis titles her third state-law claim "Whistle Blower." (3d. Am. Compl. at 17.) Lewis does not plead the specific elements of this claim; she instead asserts that there was a "clear cover up" of the gas leak but that, due to her efforts, some of the gas was found on April 20, 2012. (3d. Am. Compl. at 17.)

The Court believes that, in this case, it is inappropriate to exercise supplemental jurisdiction over these state-law claims. *See* 28 U.S.C. § 1367(c)(3) (providing that a federal district court may decline to exercise supplemental jurisdiction over state-law claims if "the district court has dismissed all claims over which it has original jurisdiction . . . ."). The Court recommends dismissal of Lewis' claims under the ADEA, and "[w]hen all federal claims are dismissed before trial, the balance of considerations usually will point to dismissing the state law claims[.]" *Musson Theatrical, Inc. v. Express Corp.*, 89 F.3d 1244, 1254–55 (6th Cir.1996); *see also Wee Care Child Ctr., Inc. v. Lumpkin*, 680 F.3d 841, 849 (6th Cir. 2010) ("As [plaintiff's] one federal claim was properly dismissed, it was likewise proper for the district court to decline to exercise supplemental jurisdiction over the remaining state law claims."); *Ketola v. Clearwater*, No. 08-cv-31, 2008 U.S. Dist. LEXIS 104205, at *13-14, 2008 WL 4820499 (W.D. Mich. Oct. 31, 2008) ("Where a district court has exercised jurisdiction over a state-law claim solely by virtue of supplemental jurisdiction and the federal claims are dismissed prior to trial, the state-law claims should be dismissed without reaching their merits.").

Two other points support declining to exercise supplemental jurisdiction over Lewis' state-law claims. First, the tie between Lewis' claims pursuant to the ADEA and her state-law claims about asbestos and a gas leak is not strong. Second, in another suit Lewis brought against MIOSHA

35

about the gas, the Court has already declined to exercise supplemental jurisdiction over Lewis' state-law claims. *Lewis v. Michigan Occupational Safety & Health Admin.*, No. 13-10889, 2013 WL 2050479, at *4 (E.D. Mich. May 3, 2013) (finding that federal claims in the complaint did not state a claim for relief and recommending that the court decline jurisdiction over remaining state-law claims), *report and recommendation adopted*, 2013 WL 2049549 (E.D. Mich. May 14, 2013) (adopting report and recommendation but declining to dismiss suit until resolution of a pending motion to amend); *Lewis v. Michigan Occupational Safety & Health Admin.*, No. 13-10889, slip order (E.D. Mich. Aug. 13, 2013) (order denying motion to amend).

## IV.

For the foregoing reasons, this Court RECOMMENDS that "Defendants Jenkins and Detroit Public Schools Corrected Motion for Summary Judgment on Plaintiff's Third Amended Complaint" (Dkt. 51) be GRANTED IN PART. The motion should be GRANTED to the extent it asserts that Lewis' Third Amended Complaint fails to state a claim under the ADEA. Defendants' motion should be DENIED WITHOUT PREJUDICE to the extent that it asserts that Lewis' state-law claims fail to state a claim upon which relief may be granted. Instead, the Court should exercise its discretion pursuant to 28 U.S.C. § 1367(c)(3) and DISMISS Lewis' state-law claims WITHOUT PREJUDICE. Consistent with these recommendations, Lewis' Third Amended Complaint (Dkt. 39) should be DISMISSED.

It follows from the above recommendation that Lewis' "Emergency Motion for Temporary Injunction" (Dkt. 65) should be DENIED AS MOOT.

## V.

The parties to this action may object to and seek review of this Report and Recommendation within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140 (1985); *Frontier Ins. Co. v. Blaty*, 454 F.3d 590, 596 (6th Cir. 2006); *United States v. Sullivan*, 431 F.3d 976, 984 (6th Cir. 2005). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830 (6th Cir. 2006) (internal quotation marks omitted); *Frontier*, 454 F.3d at 596-97. Objections are to be filed through the Case Management/Electronic Case Filing (CM/ECF) system or, if an appropriate exception applies, through the Clerk's Office. *See* E.D. Mich. LR 5.1. A copy of any objections is to be served upon this magistrate judge but this does not constitute filing. *See* E.D. Mich. LR 72.1(d)(2). Once an objection is filed, a response is due within fourteen (14) days of service, and a reply brief may be filed within seven (7) days of service of the response. E.D. Mich. LR 72.1(d)(3), (4).

s/Laurie J. Michelson
LAURIE J. MICHELSON
UNITED STATES MAGISTRATE JUDGE

Dated:  September 23, 2013

## CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing document was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 23, 2013.

s/Jane Johnson
Deputy Clerk
